## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00978-JLK

K.L.M.,

 Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

 Defendant.

---

## MEMORANDUM DECISION ON APPEAL

---

Kane, J.

 Plaintiff K.L.M.[1] challenges the final decision of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security (the "Commissioner"), denying her application for Supplemental Security Income. That denial was confirmed most recently, in 2020, by an administrative law judge ("ALJ"), who determined that K.L.M. was not disabled within the meaning of the Social Security Act and therefore is not entitled to SSI benefits. After the Social Security Appeals Council declined review, K.L.M. filed this appeal.

 K.L.M. contends the ALJ failed to properly weigh her treating physician's medical opinion and to account for her symptoms in determining her capacity for work. I find the ALJ erred in his evaluation of both the treating physician's opinion and K.L.M.'s symptoms and therefore reverse and remand the case.

---

[1] The Local Rules provide that "[a]n order resolving a social security appeal on the merits shall identify the plaintiffs by initials only." D.C.COLO.LAPR 5.2(b). Accordingly, I refer to Plaintiff using her initials only.

# I.  EVIDENCE IN THE RECORD

On September 9, 2012, K.L.M. was involved in a motor vehicle collision. She was treated at the emergency room a few days later. Administrative Record ("AR") 377.[2] The X-rays taken of her cervical and lumbar spine while she was there were provisionally read as negative for any findings. AR 378. She was diagnosed with cervical and lumbar strain. *Id.*

Magnetic resonance imaging ("MRI") of K.L.M.'s cervical spine from March 2013 showed "multilevel osteophyte formation with minimal disc bulges" but "[n]o significant central canal stenosis or neuroforaminal narrowing." AR 250. An MRI of her lumbar spine at that same time showed "mild multilevel degenerative changes, most pronounced at L4-L5," but no "acute abnormality." AR 253.

K.L.M. filed her application for SSI in April 2013. AR 60. She alleges that she became disabled on September 9, 2012, after sustaining injuries to her neck and back in the motor vehicle collision. AR 60-61, 29-30, 192, 203.

In May and June 2013, Plaintiff received physical therapy. AR 408-17. The physical therapist's notes indicate that, at the beginning of her treatment, K.L.M. was having pain while sleeping, lifting, and getting out of a chair. AR 409. At that time, her cervical and lumbar spine range of motion was within functional limits, but the motion caused K.L.M. pain. *Id.* On May 9, 2013, the Progress/Treatment Note states: "Patient walked back into treatment room smiling and plopped herself down as she noted being 'in a lot of pain.'" AR 413. The Note from May 14, 2013, documents K.L.M. presented with pain at a 9 out of 10, yet "[w]ith pain rating so high, [she] was able to ambulate back to treatment room, and 'Plop['] down on table, swing legs around and lay straight back without [complaining of] pain." AR 414. That same note reports

---

[2] The Administrative Record in this case is located at ECF No. 12, including subparts 1 through 14.

K.L.M.'s "pain rating appear[ed] to not match [her] ability to perform [her] ex[ercises]." *Id.*

In December 2013, K.L.M. underwent a consultative examination with Dr. William Niehaus. AR 425-430. In his Report, Dr. Niehaus wrote that K.L.M.:

> appeared to sit comfortably during the exam and without pain-mitigating movements. She did not appear uncomfortable getting on and off the examination table, removing shoes, and arose spontaneously and unaided from a seated position without discernible discomfort.

AR 427. He noted that she had discernible discomfort with normal cervical and lumbar ranges of motion and cervical and lumbar sacral paraspinal tenderness bilaterally. AR 428-29. But she was found to have full strength bilaterally in her upper and lower extremities. AR 429. Dr. Niehaus reported that K.L.M. could independently get out of bed, dress and bathe herself, drive, cook, clean, and go for occasional walks. AR 427. Ultimately, Dr. Niehaus provided the following functional assessment:

> There are no recommended limitations regarding the number of hours she should be able to sit during a normal 8-hour workday. The claimant should be able to take frequent breaks when her pain is increasing. There are no limitations on the number of hours she should be able to stand and walk during a normal 8-hour workday given that she is able to take frequent breaks in order to ensure managing her cervical and lumbar sacral back pain. Weightbearing: The claimant should be able to carry 15 to 20 pounds occasionally during a normal 8-hour workday. The claimant's bending, squatting, and twisting should be limited to occasionally secondary to lumbar sacral back pain. There are no recommended limitations with reaching, pulling, handling, grasping, fingering, or feeling.

AR 430.

In 2013, 2014, and 2015, K.L.M. received treatment from Dr. Douglas Hess, who listed her diagnoses as: degenerative disc disease, foraminal stenosis of lumbar region, lumbar facet arthropathy, intervertebral lumbar disc disorder with myelopathy, intervertebral cervical disc disorder with myelopathy, and osteophyte of cervical spine. *See* AR 475, 478, 606, 608. Throughout her treatment with Dr. Hess, K.L.M. consistently showed decreased range of motion

in her neck and decreased sensation in her right C5-C6 and C6-C7 distribution but normal strength in her upper extremities. AR 475 (5/7/2014), 478 (11/4/2013), 606 (1/14/2015), 608 (12/19/2014). Dr. Hess administered an epidural steroid injection in K.L.M.'s cervical spine on March 1, 2014, and November 16, 2014, and her lumbar spine on November 17, 2013. AR 476, 479, 609. In May 2014, Dr. Hess indicated K.L.M.'s condition limited her to:

- Lifting or carrying 10 pounds for up to one-third of an 8-hour workday;

- Sitting for 30 minutes at a time and for a total of 4 hours in an 8-hour workday;

- Standing for 30 minutes at a time and for a total of 4 hours in an 8-hour workday; and

- Only occasionally stooping, squatting, crawling, and kneeling.

AR 449-450. Dr. Hess also noted that K.L.M. needs to lie down 4 to 5 times per day for 30 minutes at a time. AR 450. Then, in December 2014, Dr. Hess reported that "[h]er present pain medication regimen does allow her to do the activities of daily living, and care for her home and her family, but not much more." AR 608.

MRIs of her cervical and lumbar spine were performed in June 2016 and compared to her previous imaging from March 2013. AR 1254-57. The MRI of her cervical spine showed "minimal age-related changes in the cervical spine with minimal increase in size of a posterior disc protrusion at the C5-C6 level" but "no areas of significant central canal or neural foraminal stenosis." AR 1256.  On the MRI of her lumbar spine, the small posterior central disc protrusion at the L4-L5 level appeared smaller than it was in March 2013, there was no longer any central canal stenosis at that level, and "no areas of significant neural foraminal stenosis [we]re identified." AR 1254.

A computed tomography ("CT") scan of K.L.M.'s cervical spine was performed in December 2016 when she was involved in another motor vehicle collision. AR 1240-41, 1245-

48. The CT scan showed "[c]hronic degenerative vertebral body endplate osteophytosis with anterior longitudinal ligament calcification" at levels C4-C7 but again "[n]o significant spinal canal or neuroforaminal stenosis." AR 1241, 1246-48.

K.L.M. had additional imaging done in March 2018. An MRI of her cervical spine showed mild bulging discs at levels C3-C4, C4-C5, and C6-C7 with no stenosis and a 3 x 4 mm central disc protrusion at level C5-C6 with mild central spinal stenosis. AR 1134. An MRI of her lumbar spine showed a bulging disc with a 5 mm central disc protrusion along with bilateral facet arthropathy and mild foraminal narrowing at the L4-L5 level. AR 1136.

In June of 2018, K.L.M. visited the emergency room for "exacerbation of her chronic neck pain." AR 1138. The medical records from that visit document that her neck "ha[d] no significant tenderness and [her] range of motion [wa]s adequate." AR 1139. Her low lumbar region and her lower extremity were observed to have "very minimal tenderness." *Id.* The physician noted that he felt K.L.M. was "in the emergency department looking for pain medication as well as a note to state that she was [t]here." AR 1140.

K.L.M. had another CT scan of her neck performed in February 2019. AR 1337. It showed "[m]ild endplate osteophytes and changes of degenerative disc disease . . . along the mid and lower" cervical spine. *Id.*

In July 2019, K.L.M. sought treatment in the emergency room once more, requesting the "shot that helps [her] chronic neck and back pain." AR 1374. The treatment notes document that she had tenderness to the muscles in her lumbar region but normal range of motion and strength in her extremities. AR 1376. And she was observed walking into the patient room and to the waiting department without difficulty. AR 1377. The physician determined there was no clinical indication to conduct imaging and referred K.L.M. to a new primary care physician and a pain

specialist. *Id.*

Later that year, Dr. Eric Bernauer administered epidural steroid injections in K.L.M.'s lumbar spine. AR 1372-73. K.L.M. requested that he also perform a cervical epidural steroid injection, but he advised her that the "MRI of her cervical spine shows no evidence of either central canal or foraminal stenosis throughout her cervical spine" and so the injection had "no chance of benefitting her." AR 1372. The physician did give her multiple trigger point injections at trigger points identified in her neck. *Id.* At a follow-up appointment for the injections, Physician Assistant ("PA") Grant Nichols noted that the injections did not help K.L.M. with her pain for more than a few days but that she had previously received a Toradol shot in the emergency room that helped quite a bit. AR 1383. He also commented that "[h]er imaging studies have really been pretty unremarkable for the amount of pain she reports." *Id.*

In September and October 2019, K.L.M. underwent another round of physical therapy. AR 1389-1439. She also received additional Toradol and trigger point injections in December 2019 and January 2020. AR 1456, 1460, 1466, 1471, 1476. At K.L.M.'s December 12, 2019 visit for the injections, PA Nichols noted that she had found the Toradol shot and trigger point injections the previous week to be helpful. AR 1471. PA Nichols also declined to excuse K.L.M. from the community service she was performing at the ARC. AR 1471, 1474. At her January 22, 2020 visit, K.L.M. indicated that the trigger point injections she had administered in November of 2018 were helpful and she would like to keep doing them. AR 1453.

The ALJ held a hearing on April 30, 2020, before issuing his unfavorable decision. Medical expert Dr. John Kwock testified at the hearing. Dr. Kwock is an orthopedic surgeon. AR 1515. He reviewed K.L.M.'s submitted medical records before testifying. AR 670. He opined that K.L.M. suffered from the medically determinable impairments of "minimal mild

degenerative disc and degenerative joint disease" of the cervical spine and lumbar spine. AR 670-71. Dr. Kwock concluded that K.L.M. could perform at the "medium work exertional level." AR 671. Nevertheless, he testified that the following work-type limitations would be warranted:

- Lifting and carrying "up to 10 pounds on a continuous basis, up to 20 pounds on a frequent basis and up to 50 pounds occasionally";

- Sitting "for six hours out of the eight" and "walk[ing] for six hours out of the eight"; and

- "Stooping and crawling . . . occasional[ly]."

AR 671-72. But he stated K.L.M. should have no upper extremity limitations and could frequently: use her feet; balance; kneel; crouch; climb ladders, scaffolds, stairs, ramps, and the like; and work in high, exposed, and unprotected heights and in proximity to heavy machinery. AR 672.

K.L.M. also testified at the April 2020 hearing. She explained that she was still receiving Toradol shots weekly and trigger point injections every two weeks and that they would help her for two to three days and then her pain would be back. AR 675. During those two to three days of relief, K.L.M. stated she was able to clean her house, wash her clothes, and sweep the floor, and she did not need to take "repeated hot baths or hot showers to ease [her] pain." AR 677-78. On days when the effects of the shots had diminished, she testified that she could not accomplish much and would lie down for a couple of hours, constantly use heating pads, and take about six hot baths. AR 678. She reported that, on those days, has to be laying down and cannot "sit or stand more than a half-hour at a time." AR 679. K.L.M. was 34 years old when the most recent ALJ decision was issued, and she has a limited education. *See* AR 657; Pl.'s Opening Br., ECF No. 13 at 7.

## II.  DETERMINING DISABILITY UNDER THE SOCIAL SECURITY ACT

To qualify for SSI, a claimant must be disabled and must be eligible based on her income and resources. 42 U.S.C. § 1381a. A claimant can only be found to be disabled if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). In evaluating disability, the Commissioner follows a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 416.920(a)(4); *see also* Carolyn A. Kubitschek & Jon C. Dubin, Soc. Sec. Disability L. & Proc. in Fed. Court § 3.1 (2022 ed.) (explaining the five-step process). Should the ALJ find at any step that the claimant is not disabled, the process need go no further. 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof regarding the first four steps, and the Commissioner must satisfy the fifth. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).

At step one, the ALJ must find that the claimant is not engaged in "substantial gainful activity," as that term is defined in the Social Security regulations. 20 C.F.R. § 416.920(a)(4)(i). At step two, the ALJ must deem the claimed impairment to be severe, medically determinable, and of sufficient duration. *Id.* § 416.920(a)(4)(ii). At step three, the ALJ will consider whether any of the claimant's impairments or combination of impairments meets or equals in severity one of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and if it does, the ALJ will find the claimant to be disabled. *Id.* § 416.920(a)(4)(iii). Otherwise, the ALJ will determine a claimant's residual functional capacity ("RFC") and then move on to the fourth step at which the ALJ must find, based on that RFC, that the claimant cannot perform any of her past relevant work. *Id.* § 416.920(a)(4)(iv). Finally, at step five, the Commissioner has the burden of showing that the

claimant's RFC, age, education, and work experience would allow her to adjust to other work. *Id.* § 416.920(a)(4)(v). If the Commissioner cannot make such a showing, the claimant must be found to be disabled. *Id*

### III. THE COMMISSIONER'S DETERMINATION THAT K.L.M. IS NOT DISABLED

K.L.M.'S application for SSI was initially denied on June 13, 2013. AR 66. After the denial, K.L.M. requested a hearing and appeared in front of an ALJ. AR 8, 24, 40. The ALJ issued an unfavorable decision on May 15, 2015. AR 12-23. K.L.M. sought review by the Social Security Administration's Appeals Council, AR 8, which denied her request. AR 1. K.L.M. then filed an appeal in this court, and my colleague Judge Martinez vacated the Commissioner's decision and remanded for rehearing. *Mooring v. Berryhill*, No. 16-cv-2645-WJM, 2017 WL 5838162, at *4 (D. Colo. Nov. 29, 2017). Judge Martinez determined that the hypotheticals the ALJ presented to the vocational expert at step five of the sequential evaluation did not fully align with the ALJ's RFC findings. *Id.* at *2-3. On remand, another ALJ found that K.L.M. was not disabled. AR 754-61. K.L.M. again sought review by the Appeals Council, and that time, the Council remanded the case to the ALJ on the grounds that the ALJ "did not provide sufficient rationale in support of discounting the opinion[s] of" Drs. Neihaus and Hess. AR 764-65. The Appeals Council directed the ALJ to give further consideration to these opinions and K.L.M.'s residual functional capacity and to obtain additional evidence from a vocational expert and, if necessary, from a medical expert. AR 765. This produced another unfavorable decision from the same ALJ. *See* AR 648-65. Once more, K.L.M. requested review by the Appeals Council, which found no basis to assume jurisdiction. AR 639. K.L.M. later filed this appeal.

The last unfavorable decision, issued May 20, 2020, is the final decision of the

Commissioner, and the one subject to review in this appeal. *See* 20 C.F.R. § 416.1484(b)(2). In that decision, the ALJ determined at step one of the sequential evaluation process that K.L.M. had not engaged in substantial gainful activity since the date of her application for benefits. AR 650. At step two, the ALJ identified K.L.M.'s "minimal to mild degenerative disc/joint disease of the cervical spine and minimal to mild degenerative disc/joint disease of the lumbar spine" as severe impairments that significantly limit her ability to perform basic work activities. *Id.* The ALJ found K.L.M. to have other medically determinable impairments as well, "such as a history of pancreatitis, obesity, and a furuncle of the buttock," but he categorized them as non-severe impairments. *Id.* At step three of the sequential evaluation, the ALJ determined that K.L.M. does not have an impairment or combination of impairments that meets one listed in the Social Security regulations. AR 651.

The ALJ then considered the medical evidence and K.L.M.'s testimony and found that she has the RFC "to perform medium work as defined in 20 C.F.R. § 416.967(c) except that she can frequently, not constantly, use foot and leg controls; only occasionally bend, squat, and kneel; and have only occasional exposure to moving machinery and unprotected heights." AR 651. Medium work is defined in 20 C.F.R. § 416.967(c) as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." If a claimant is found to be capable of medium work, it means she can also perform sedentary and light work. 20 C.F.R. § 416.967(c). "[A] job is in [the light-work] category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* § 416.967(b).

In reviewing the medical evidence, the ALJ accorded great weight to Dr. Kwock's opinion and only limited weight to the opinions of Drs. Hess and Niehaus. AR 653-657. He

observed that K.L.M.'s "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in []his decision." AR 652-53. The ALJ reasoned that Dr. Kwock's opinion was entitled to great weight because it was "based on his review of the complete medical evidence of record in th[e] case and, along th[o]se lines, consistent with the . . . record as a whole showing largely unremarkable objective findings across the longitudinal period at issue." AR 653. Another reason the ALJ provided for affording Dr. Kwock's opinion great weight was "his relevant specialization and board certification in orthopedic surgery." AR 656. In contrast, the ALJ accorded limited weight to the opinions of Drs. Neihaus and Hess because they were "significantly inconsistent with Dr. Kwock's opinion" and were "inconsistent with contemporaneous objective findings and reports of significant activities of daily living." *Id.* The ALJ also noted that Dr. Kwock "had the opportunity to consider, but clearly rejected the more limiting opinions of Drs. Niehaus and Hess." *Id.*

At step four, the ALJ found K.L.M. has no past relevant work. AR 657. And, at step five, the ALJ determined that, considering K.L.M.'s RFC, age, education, and work experience, jobs "exist in significant numbers in the national economy" that she could perform. *Id.* As a result, he concluded that she is not disabled. AR 658.

## IV.  STANDARD OF REVIEW

My review of the ALJ's decision is limited to whether the decision is in accordance with the law and whether the findings are supported by substantial evidence in the record. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a

scintilla, but less than a preponderance." *Id.* (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Grogan*, 399 F.3d at 1261-62  (citation omitted). A court may neither reweigh the evidence nor substitute its judgment for that of the agency. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted).

## V. ANALYSIS

K.L.M. raises two issues on appeal. She argues that the ALJ did not properly weigh the opinion of her treating physician, Dr. Hess. And she contends that the ALJ did not fully take into account the symptoms she alleges. In reviewing these issues, I find the ALJ's decision suffers from the same error for both—it fails to connect the dots between the ALJ's evaluation of the evidence and the RFC formulated. Additionally, the ALJ's decision does not reflect that he considered all the requisite factors in assessing Dr. Hess's opinion.

### A.  The ALJ's Weighing of Dr. Hess's Opinion

The opinions of treating sources are generally entitled to more weight than other medical opinions. 20 C.F.R. § 416.927(c)(2).[3] In determining what weight to assign a treating source's opinion, an "ALJ must complete a sequential two-step inquiry, each step of which is analytically distinct." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). An ALJ must first determine whether the treating-source opinion is entitled to controlling weight, and if it is not, the ALJ must

---

[3] "[T]he Social Security Administration has recently promulgated regulations, attempting to significantly alter previous policy regarding the evaluation of medical evidence and the relative weight to treating physician and other medical evidence and applicable to claims filed after March 27, 2017." Kubitschek & Dubin, *supra*, § 2.30. However, for claims filed before March 27, 2017, as K.L.M.'s was, the prior framework applies. *See id.*; 20 C.F.R. § 416.927. The ALJ cited the prior regulation in his analysis. AR 651.

evaluate what weight the opinion merits. *Id.*

For treating-source opinions to be given "controlling weight," an ALJ must find that the opinion is "not inconsistent" with other substantial evidence in the record. 20 C.F.R. § 416.927(c)(2). Here, K.L.M. acknowledges that Dr. Hess's opinion is inconsistent with Dr. Kwock's opinion and other evidence in the record and so is not entitled to controlling weight. Pl.'s Opening Br., ECF No. 13 at 12-13; Pl.'s Reply Br., ECF No. 17 at 3-4 ("Plaintiff agrees that Dr. Hess's opinion is not entitled to controlling weight—simply because there was conflicting evidence in the record."). "Even if a treating opinion is not given controlling weight, it is still entitled to deference; at the second step in the analysis, the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the [Social Security] regulations . . ., for the weight assigned." *Krauser*, 638 F.3d at 1330 (citation omitted).

K.L.M. presents three main objections to the ALJ's evaluation of Dr. Hess's opinion. First, she criticizes the ALJ for "fail[ing] to separately apply" each step of the two-step inquiry set out in *Krauser v. Astrue*. Pl.'s Reply Br., ECF No. 17 at 4. Second, K.L.M. contends the ALJ did not properly evaluate the factors applicable at the second step. And, third, she faults the ALJ for not explaining which parts of Dr. Hess's opinion he accepted or rejected and his specific reasoning for doing so. I address each of these arguments in turn.

*Application of Each Step of the Two-Step Inquiry*

K.L.M. acknowledges that the ALJ discussed how Dr. Hess's opinion is inconsistent with other evidence in the record. However, she faults the ALJ for not specifying whether that discussion was part of his initial controlling-weight analysis or part of his step-two evaluation of

the factors for assigning weight. Pl.'s Reply Br., ECF No. 17 at 4 ("[T]he ALJ combined and intermingled the two steps."). In support of her argument, K.L.M. cites *Krauser* and emphasizes its description of the second step of the analysis as a "distinct inquiry." 638 F.3d at 1330-31. But that language does not mean that consideration of the two steps cannot overlap or that it must be formatted in a particular way. In *Krauser*, the court found that the ALJ's assessment of the treating source's opinion was "patently inadequate for the distinct reason that it ends halfway through the required two-step analysis." *Id.* at 1331. The court observed: "the ALJ simply concluded that '[the treating source's] opinion . . . cannot be given controlling weight' and then *said no more about it*." *Id.* (citation omitted). Here, the ALJ did not simply stop after the first step. He assigned limited weight to Dr. Hess's opinion and gave *some* explanation for doing so. AR 656. I find that the substance of the ALJ's explanation, not its presentation, is inadequate.

*Evaluation of the Applicable Factors*

When an ALJ does not give a treating source's opinion controlling weight, the ALJ must take into account the following factors listed in the applicable Social Security regulation:

(1) the examining relationship between the physician and the applicant;

(2) the length, nature, and extent of the treatment relationship;

(3) the evidentiary support for the opinion;

(4) the consistency of the opinion with the record as a whole;

(5) the medical source's specialty; and

(6) other factors, such as the source's understanding of Social Security disability programs and the extent to which the source is familiar with other information in the record.

20 C.F.R. § 416.927(c); *see also Krauser*, 638 F.3d at 1331. While an ALJ need not "expressly

apply" each factor, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007), "the record must reflect that the ALJ *considered* every factor in the weight calculation." *Andersen v. Astrue*, 319 F. App'x 712, 720 (10th Cir. 2009) (unpublished).

As K.L.M. argues, it is not clear the ALJ considered all the applicable factors in assigning limited weight to Dr. Hess's opinion. The ALJ seems to have first determined Dr. Kwock's opinion was entitled to great weight and then discounted Dr. Hess's opinion as a result of that determination. *See* AR 656 ("[B]ased on according great weight to Dr. Kwock's opinion for the reasons set forth above, the opinions of Drs. Niehaus and Hess are, overall, accorded limited weight."). Even if he properly afforded great weight to Dr. Kwock's opinion, the ALJ still needed to consider every applicable factor in his evaluation of Dr. Hess's opinion. *See Lopez v. Colvin*, 642 F. App'x 826, 832 (10th Cir. 2016) (unpublished) ("Though the ALJ could assign great weight to [nonexamining medical expert's] opinion, the ALJ still had to address the opinions of [the treating physician] and [consultative examiner].").

Specifically, the ALJ decision's does not support that he considered the length, nature, and extent of their Dr. Hess's treatment relationship with K.L.M. or that he appreciated Dr. Hess's specialty. An ALJ must generally give more weight "to medical opinions from [a claimant's] treating sources, since th[o]se sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. 416.927(c)(2); *see also Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) ("Even if a treating physician's opinion is not entitled to controlling weight, [t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors [in the

applicable regulations].” (internal quotation marks and citation omitted)). Although the ALJ

identified Dr. Hess as a treating physician, AR 648, 654, he did not attribute significance to that

fact. The ALJ credited Dr. Kwock’s opinion because it was “based on his review of the complete

medical evidence of record.” AR 653. But the ALJ did not explain why this review of the

medical evidence was more significant than Dr. Hess’s treating relationship.[4] The ALJ likewise

gave greater weight to Dr. Kwock because of “his relevant specialization and board certification

in orthopedic surgery.” AR 656.  The ALJ did not, however, mention Dr. Hess’s specialty or

consider it in affording his opinion limited weight.

On remand, the ALJ must craft his decision so it reflects that he considered every

applicable factor in weighing Dr. Hess’s opinion. *See Andersen*, 319 F. App’x at 720.


*Partial Rejection and Acceptance of Opinions*

The ALJ also erred by failing to explain what parts of Dr. Hess’s opinion he accepted and

what parts he rejected and why. The ALJ’s decision states:

> [I]n considering the claimant’s above-described allegations in a light most
> favorable to her, the undersigned has found somewhat different postural limitations
> and somewhat more limited environmental limitations than those opined by Dr.
> Kwock. This finding of different or more limited postural and environmental
> limitations than opined by Dr. Kwock also accounts to some extent for the much
> more limiting opinions both consultative examining physician Dr. Niehaus and
> especially treating physician Dr. Hess. However, based on according great weight
> to Dr. Kwock’s opinion for the reasons set forth above, the opinions of Drs. Niehaus
> and Hess are, overall, accorded limited weight.

AR 656. No rationale can be gleaned from this writing. As K.L.M. describes the problem:

> [T]he ALJ’s RFC limitation to occasional bending, squatting, and kneeling . . . is
> consistent with Dr. Hess’s postural limitations . . . . This finding raises the question
> of why Dr. Hess’s postural limitations survive despite all the deficiencies noted by

---

[4] The ALJ mentioned that “Dr. Kwock had the opportunity to consider, but clearly rejected, the
more limiting opinions of Drs. Niehaus and Hess.” AR 656. Yet, Dr. Kwock never mentioned
Dr. Hess’s opinion. *See* AR 670-72.

> the ALJ. Or conversely, why Dr. Hess's limitations on lifting, sitting and standing did not also survive. The ALJ did not explain why his RFC findings adopted only some but not all of Dr. Hess's restrictions.

Pl.'s Opening Br., ECF No. 13 at 16. The ALJ cannot arbitrarily accept or reject portions of the various medical opinions. *See Benavidez v. Colvin*, 650 F. App'x 619, 621 (10th Cir. 2016) (unpublished) ("[A]n ALJ cannot, without explanation, adopt some restrictions assessed by a physician and reject others that the physician also assessed."); *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("[T]he ALJ should have explained why he rejected four of the moderate restrictions on [the] RFC assessment [by the consulting mental health professional] while appearing to adopt the others."). The ALJ must offer some basis for adopting a few of Dr. Hess's limitations and rejecting others, and he did not in this case. Such a deficiency makes full review impossible and remand unavoidable.

Citing *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012), the Commissioner argues that the ALJ was permitted to temper the extremes of Dr. Kwok's opinion after giving it substantial weight. Def.'s Resp. Br. at 12, ECF No. 16. In *Chapo*, however, the ALJ "flatly rejected" the opinion of the claimant's treating physician. 682 F.3d at 1288. The ALJ then accorded weight only to the consulting physician's opinion and tempered that opinion in the claimant's favor. *Id.* The court commented: "[W]e are aware of no controlling authority holding that the full adverse force of a medical opinion cannot be moderated favorably in this way unless the ALJ provides an explanation for extending the claimant such a benefit." *Id.* But the ALJ here did not reject Dr. Hess's opinion in its entirety and did not moderate Dr. Kwock's opinion the same way the ALJ did in *Chapo*.[5]

---

[5] The Commissioner also cites to *Smith v. Colvin*, in which the Tenth Circuit held that the ALJ did not err by "arriv[ing] at an assessment between the two medical opinions without fully embracing either one." 821 F.3d 1264, 1268 (10th Cir. 2016). But the error here is not that the ALJ formulated K.L.M.'s RFC to fall between two medical opinions; it is that the ALJ did not

On remand, the ALJ must specify which parts of the medical opinions he is accepting and which he is rejecting and why.

**B.  The ALJ's Assessment of the Symptoms Alleged by K.L.M.**

K.L.M. also contends that the ALJ improperly assessed her symptoms. In evaluating the symptoms alleged by a claimant, an ALJ must follow another two-step process. *See* 20 C.F.R. § 416.929; SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017); Kubitschek & Dubin, *supra*, § 4.2. First, an ALJ must determine whether the claimant has a "medically determinable impairment[] that could reasonably be expected to produce [her] alleged symptoms." SSR 16-3p, 2017 WL 5180304, at *3 (emphasis removed). If the claimant is found to have such an impairment, the ALJ must then "evaluate the intensity and persistence of [the claimant's] symptoms such as pain and determine the extent to which [her] symptoms limit[] her ability to perform work-related activities." *Id.* at *4; 20 C.F.R. § 416.929(c). At this second step, the ALJ must consider the objective medical evidence and any other evidence relating to:

(1) the claimant's daily activities;

(2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms;

(3) precipitating and aggravating factors;

(4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken;

(5) treatment the claimant receives or has received;

(6) any measures the claimant uses or has used to relieve the pain or other symptoms; and

(7) other factors concerning the claimant's functional limitations and restrictions.

---

provide a sufficient explanation in doing so.

*Id.* § 416.929(c)(2)-(3). An ALJ's decision "must contain specific reasons for the weight given to the [claimant's] symptoms, be consistent with and supported by the evidence, and be clearly articulated so the [claimant] and any subsequent reviewer can assess how the adjudicator evaluated the [claimant's] symptoms." SSR 16-3p, 2017 WL 5180304, at *10. But the ALJ is not required to perform "a formalistic factor-by-factor recitation of the evidence;" he need only "set[] forth the specific evidence he relie[d] on." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

K.L.M. first attacks the ALJ's evaluation of the applicable factors and, in doing so, asks me to reweigh the evidence and substitute my judgment for that of the ALJ, which I cannot do. *See Hamlin*, 365 F.3d at 1214. But the second error she highlights—that the ALJ failed to specify how her symptoms limited her capacity for work—must be remedied on remand. Pl.'s Reply Br., ECF No. 17 at 8.

*Evaluation of the Applicable Factors*

At step one of his assessment of K.L.M.'s symptoms, the ALJ found "her medically determinable impairments could reasonably be expected to cause some of [her] alleged symptoms." AR 652. He then determined, at step two of the required analysis, that her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." AR 652-53. As the Commissioner explains, the ALJ found K.L.M.'s reported symptoms "were inconsistent with: (1) normal (or minimally abnormal) objective medical evidence, (2) her limited treatment, (3) the efficacy of her limited treatment, and (4) her work activity." Def.'s Resp. Br. at 19 (citing AR 655-56).

K.L.M. contends "[t]he ALJ did not explain why the abnormalities shown on [her] imaging studies . . . do not support [her] allegations about her symptoms." Pl.'s Opening Br., ECF No. 13 at 23. The Social Security regulations acknowledge that "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." 20 C.F.R. § 416.929(c)(3); *see also* SSR 16-3p, 2017 WL 5180304, at *5 (The ALJ "will not disregard [a claimant's] statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual."); *id.* ("Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques."). And it is true that mild observations in the objective medical evidence do not equate to mild pain. *See Andersen* 319 F. App'x at 725-26.

However, the ALJ found that K.L.M.'s reported symptoms were not "not entirely consistent with [both] the medical evidence and other evidence in the record." AR 652. The ALJ pointed to the statement of PA Nichols that K.L.M.'s imaging studies have "really been pretty unremarkable for the amount of pain she reports." AR 653, 655 (quoting PA Nichols' September 2019 note). The ALJ also reviewed many of the other factors set out in 20 C.F.R. § 416.929(c)(2)-(3). He found K.L.M.'s statements to Dr. Niehaus regarding her activities of daily living to "call[] into question the functionally limiting effect of [her] symptoms during the early part of the period at issue." AR 654. Additionally, the ALJ referenced K.L.M.'s report to Dr. Hess that her pain medication regimen in December 2014 allowed her to perform her activities of daily living. AR 655. K.L.M. claims the ALJ ignored her testimony that she is only able to clean her house and do laundry on the few days following her injections. Pl.'s Opening Br., ECF No. 13 at 24 ("[T]he ALJ ignored the efforts [K.L.M.] went through (repetitive baths and showers,

and lying down) to relieve her pain after the injections wore off."). The ALJ specifically reviewed this testimony in his decision, though. AR 652 ("[K.L.M.] further testified at the April 30, 2020 hearing that while she is able to clean the house and do laundry on days following her Toradol shots and trigger point injections, when she experiences pain relief, she otherwise has to take hot baths or showers on a repetitive basis.").

In addition, the ALJ stated: "[K.L.M.] has been able to work at ARC doing community service, which community service appears to have included hanging about 300 shirts in one day . . . . Given this report, . . . it is unclear why, with ongoing treatment, [she] is unable to engage in at least a limited range of work activity." K.L.M. insists that the ALJ improperly relied on her community service as proof that she could work. According to K.L.M., the ALJ ignored that she told her physical therapist that hanging 300 shirts had irritated her back and that she had asked to be excused from the community service. But K.L.M.'s argument overlooks the fact that her provider did not believe her condition was sufficiently exacerbated by the work to excuse her from it. *See* AR 1474.

The ALJ further considered K.L.M.'s limited treatment for her symptoms and the improvement she experienced from physical therapy. AR 655 ("[S]he has sought an overall limited degree of treatment of such symptoms . . . ."); AR 656 (discussing improved symptoms from physical therapy). The ALJ noted that K.L.M.'s reported improvement from her physical therapy was "seemingly inconsistent with her indication at the April 30, 2020 hearing of having been told that there are few remaining options to treat her pain." AR 656. K.L.M. argues that "the ALJ incorrectly discounted [her] testimony about her symptoms based on his speculation that the lack of more physical therapy suggested that [her] symptoms were not as severe or as limiting as she stated." Pl.'s Opening Br., ECF No. 13 at 24. However, one of the factors to be

considered under 20 C.F.R. § 416.929(c)(3) is the treatment the claimant has received. "If the frequency or extent of the treatment sought by [a claimant] is not comparable with the degree of the [claimant's] subjective complaints, . . . [the ALJ] may find the alleged intensity and persistence of [the claimant's] symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2017 WL 5180304, at *9.

While I may have viewed the evidence differently, I find the ALJ adequately evaluated K.L.M.'s reported symptoms under the applicable factors.

*Connecting the Symptoms to the Formulated RFC*

Nevertheless, K.L.M. is correct that the ALJ erred by failing to spell out how her symptoms that he found to be consistent with the evidence limited her capacity for work. Pl.'s Reply Br., ECF No. 17 at 8. An ALJ need "not explicitly state 'I find this statement credible' or 'I find this statement not credible' for each factual assertion made by" a claimant. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1169 (10th Cir. 2012). Still, an ALJ should "explain which of [a claimant's] symptoms [he] found consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the [claimant's] symptoms led to [his] conclusions." SSR 16-3p, 2017 WL 5180304, at *8. The ALJ found that K.L.M.'s medically determinable impairments could cause some of her symptoms. AR 652. Yet, he did not tie those credited symptoms to the RFC he provided or his conclusion that K.L.M. should be able to "engage in at least a limited range of work activity" with ongoing treatment. AR 656. On remand, the ALJ must provide some explanation.

## VI. CONCLUSION

The ALJ failed to properly weigh Dr. Hess's opinion and to connect the dots between the evidence he evaluated and K.L.M.'s ability to work. I therefore REVERSE the decision of the Commissioner through the ALJ. The matter is REMANDED[6] for the ALJ to: (1) consider all the factors in 20 C.F.R. § 416.927(c) in weighing Dr. Hess's opinion; (2) specify which parts of the medical opinions he accepts and which he rejects and why; (3) and explain how he incorporated K.L.M.'s symptoms that he credited into her RFC.

DATED this 15th day of February, 2023.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE

---

[6] K.L.M. requests that I award benefits without remanding for a new hearing. Pl.'s Reply Br., ECF No. 17 at 9. While it is within the discretion of the court to do so, *see Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006), I remand the case for the ALJ to provide additional consideration and explanation.